**CARDIAC SCIENCE, INC., a Delaware Corporation, Plaintiff,**

v.

**KONINKLIJKE PHILIPS ELECTRONICS N.V., a Netherlands corporation d/b/a Royal Philips Electronics; Philips Electronics North America Corporation, a Delaware corporation; and Philips Medical Systems North America Company, a Delaware corporation, Defendants;**

and

**Koninklijke Philips Electronics N.V., a Netherlands corporation; and Philips Electronics North America Corporation, a Delaware corporation, Counter Claimants,**

v.

**Cardiac Science, Inc., a Delaware corporation, Counter Defendant.**

Civil No. 03–1064 (DWF/RLE).

United States District Court, D. Minnesota.

Dec. 11, 2006.

---

Bruce E. Black, Esq., David K. Tellekson, Esq., Heather C. Wilde, Esq., James E. Hanft, Esq., and Robert L. Jacobson, Esq., Darby & Darby PC; and Dennis C. Bremer, Esq., and Matthew J. Goggin, Esq., Carlson Caspers Vandenburgh & Lindquist, counsel for Plaintiff and Counter Defendant.

Adam R. Steinert, Esq., Eugene L. Chang, Esq., Gary Serbin, Esq., John M. DiMatteo, Esq., Kimberly May Rosen, Esq., Spyros S. Loukakos, Esq., Steven H. Reisberg, Esq., Willkie Farr & Gallagher LLP; and Lawrence J. Field, Esq., David D. Axtell, Esq., Douglas R. Boettge, Esq., and Harold D. Field, Jr., Esq., Leonard Street and Deinard, PA, counsel for Defendant and Counter Claimant.

## MEMORANDUM OPINION AND ORDER

DONOVAN W. FRANK, District Judge.

### Introduction

This matter came before the Court on October 24, 2006, pursuant to Plaintiff Cardiac Science, Inc.'s ("Cardiac Science") Motion for Summary Judgment on the Issues of Invalidity and Noninfringement of Claims 8–10 of U.S. Patent No. 6,047,212; Defendants Koninklijke Philips Electronics

N.V., Philips Electronics North America Corporation, Koninklijke Philips Electronics N.V., and Philips Electronics North America Corporation's (collectively, "Philips") Motion for Summary Judgment of Noninfringement of U.S. Patent No. 6,029,085; and Philips' Motion for Summary Judgment on the Electrode Patents. For the reasons set forth below, the Court grants, in part, and denies, in part, the motions.

## Background

The background of this case is set forth more fully in the Court's April 20, 2006 and July 19, 2006 Orders. Briefly, this litigation involves numerous patents owned by Cardiac Science and Philips for automatic external defibrillators ("AEDs"). AEDs are portable electronic devices that allow a person with no medical training to administer a defibrillation shock to another person who is in sudden cardiac arrest.

## Discussion

### I. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *See Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353 (Fed.Cir.1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As the United States Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Fed-

eral Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

### II. '212 Patent

Philips' '212 Patent is entitled "External Defibrillator Capable of Delivering Patient Impedance Compensated Biphasic Waveforms." The application for the '212 Patent is a continuation-in-part of the application that matured as U.S. Patent No. 5,735,879. ('212 Patent at c. 1, ll: 5–8.) Generally, the '212 Patent describes a method and apparatus for using an AED to deliver a biphasic defibrillation shock to a patient. (*Id.* at c. 1, ll: 11–16.)

Philips alleges that Cardiac Science's G3 and Powerheart/Suvivalink products infringe Claim 9 of the '212 Patent. In response, Cardiac Science asserts that Claim 8, and dependent Claims 9 and 10, are invalid and/or its products do not infringe Claims 8–10. Philips does not contest that Claims 8–10 are in dispute. Therefore, the claims at issue in the '212 Patent read as follows:

8. An external defibrillator comprising:

an energy source;

first and second electrodes adapted to make contact with a patient; a plurality of electronic switches;

a controller controlling application of electrical energy from the energy source to the electrodes through the electronic switches in a truncated exponential multiphasic waveform.

8. The external defibrillator of claim 8 wherein the controller further comprises a timer.

10. The external defibrillator of claim 8 further comprising means for limiting

voltage applied across one of the plurality of electronic switches.

(*Id.* at c. 8, ll: 30–44.)

In its *Markman* Order, the Court noted that the phrase "means for limiting voltage applied across one of the plurality of electronic switches" is a means-plus-function clause, subject to 35 U.S.C. § 112, ¶ 6, and that the parties agreed that the function is limiting voltage applied across one of the plurality of electronic switches. (April 20, 2006 Order at 92–93.) The Court then determined that the corresponding structure that performs the function of limiting voltage is the fifth switch interposed between the second terminal of the energy source and the third and fourth switches. (*Id.* at 93.) The Court also construed the term "truncated biphasic (multiphasic) exponential waveform" to mean "a defibrillation shock having two (at least two) truncated exponential phases of opposite polarity." (*Id.* at 96.)

Cardiac Science now moves for summary judgment, asserting that Claims 8–10 of the '212 Patent are invalid because they fail the written description requirement of § 112, ¶ 1. Although the parties never asked the Court to construe the term "plurality of electronic switches," that term is the focus of Cardiac Science's motion.

## A. Invalidity

■ A patent is presumed valid. 35 U.S.C. § 282. A party challenging a patent's validity must establish by clear and convincing evidence that a patent is invalid. *Enzo Biochem, Inc. v. Gen–Probe Inc.,* 323 F.3d 956, 962 (Fed.Cir.2002). An alleged infringer may challenge a patent's validity by arguing, among other things, that the patentee failed to comply with the requirements of 35 U.S.C. § 112, ¶ 1. That section provides:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

This clause has been construed to mandate that a patent's specification satisfy, among other things, a written description requirement. *See LizardTech, Inc. v. Earth Resource Mapping, Inc.,* 424 F.3d 1336, 1344–45 (Fed.Cir.2005).

■ The purpose of the written description requirement is to prevent an applicant from later asserting that he invented that which he did not. *Vas–Cath, Inc. v. Mahurkar,* 935 F.2d 1555, 1561 (Fed. Cir.1991). The original patent specification must therefore "describe the claimed invention so that one skilled in the art can recognize what is claimed." *Enzo,* 323 F.3d at 968. Specifically, although it need not include information that is already known and available to the experienced public, the written description must be in sufficient detail to satisfy the statutory requirements, employing "[w]ords, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention." *Lockwood v. American Airlines, Inc.,* 107 F.3d 1565, 1572 (Fed.Cir.1997). Therefore, to satisfy the written description requirement, the patent specification must clearly allow a person of ordinary skill in the art to recognize that the inventor invented what is claimed. *Gentry Gallery Inc. v. Berkline Corp.,* 134 F.3d 1473, 1479 (Fed.Cir.1998).

While the question of whether a specification complies with the written description requirement is a question of fact, *Koito Mfg. Co., Ltd. v. Turn–Key–Tech, LLC,*

381 F.3d 1142, 1149 (Fed.Cir.2004), a court may nevertheless grant summary judgment on the issue of invalidity on written description grounds in certain circumstances. *See, e.g., LizardTech,* 424 F.3d at 1344–46 (affirming district court's grant of summary judgment on written description grounds). As the Federal Circuit has explained, "[f]or the grant of summary judgment of invalidity on written description grounds, failure of compliance must be shown as a matter of law, or as a question of ultimate fact even when any disputed facts and factual inferences are resolved against the movant." *Space Sys./Loral, Inc. v. Lockheed Martin Corp.,* 405 F.3d 985, 987–88 (Fed.Cir.2005).

### B. Claims 8–10 Fail the Written Description Requirement

■ Cardiac Science asserts that Claims 8–10 of the '212 Patent are invalid for seeking to apply to all external defibrillators that use a plurality of switches to deliver a biphasic truncated exponential ("BTE") waveform when, as illustrated in Figure 11, the '212 Patent discloses only one five-switch circuit to deliver a BTE waveform. Cardiac Science points to two statements made by one of the inventors of the '212 Patent, Daniel Powers, to support its argument.

First, during a deposition in another case involving Phillips and a third party, Powers was questioned about the family of patents related to the '212 Patent and testified as follows with respect to the '212 Patent:

Q. Now, at the time of the filing of this patent application, August 6, 1993 ... did you have any other designs for the H-bridge?

A. No.

(Munoz Decl., Ex. 3 at 85.) According to Cardiac Science, this admission demonstrates that, at most, the '212 Patent discloses only a single, five-switch circuit.

Second, during the prosecution of the '212 Patent, the patent examiner rejected the proposed claims that are now in the '212 Patent under 35 U.S.C. § 103 in light of U.S. Patent No. 5,634,938 (the "Swanson patent"), which, like the '212 Patent contains a "plurality of electronic switches element" and discloses a five-switch circuit (one switch is a capacitor circuit) that generates a biphasic waveform similar to that described in the '212 Patent. The invention contained in the Swanson patent can be used in both implantable and external applications. (Swanson patent at c. 6, ll: 47–65.) To overcome this rejection, Powers submitted a declaration to the U.S. Patent and Trademark Office ("PTO"), which distinguished the prior art by explaining that the prior art lacked load faults and did not enable a person of ordinary skill in the art to overcome the major design challenge of high voltages. Specifically, Powers stated, "[a]s an electrical engineer in the engineering arts, I would be unable to build a high voltage, high energy biphasic external defibrillator based on [Swanson], which specifically teaches how to build an implantable biphasic defibrillator." (Higman Decl., Ex. F at ¶ 8.)

According to Cardiac Science, Powers's statements to the PTO demonstrate that the Swanson patent did not teach Powers, one skilled in the art, an invention for at least one possible external defibrillator. Assuming that is true, Cardiac Science contends that it is therefore impossible for the '212 Patent, which disclosed only one five-switch circuit, to claim inventions for all external defibrillators using a plurality of switches. Second, Cardiac Science argues that Powers's statement shows that the '212 Patent solved a particular problem in the prior art in only one way, namely how to create a circuit that could

withstand voltages in excess of 1500 volts which are needed for external defibrillators. Specifically, the '212 Patent solves this problem by using an insulated gate bipolar transistor ("IGBT") for switch 5. ('212 Patent at 7, ll: 32–41.) The IGBT acts as the main switch for cutting off flow of the current through two alternative circuits, and it need not withstand the maximum capacitor voltage. (*Id.* at 7; ll: 42–47.)

According to Philips, the inventive contribution of the claims at issue is the use of electronic switches to create a BTE waveform for use in an external defibrillator. Philips contends that a person of ordinary skill in the art would understand from the patent specification that the inventors of the '212 Patent conceived the invention of using the plurality of electronic switches described in Claims 8–10, as opposed to just the five-switch embodiment illustrated in Figure 11. Citing *Bilstad v. Wakalopulos,* 386 F.3d 1116 (Fed.Cir.2004), Philips argues that it is entirely acceptable for the written description of the '212 Patent to disclose a species, or one embodiment of an invention, sufficient to describe a later-claimed genus that includes that species.

Philips explains that the species disclosed in the '212 Patent is the five-switch circuit illustrated in Figure 11. Philips points to Figure 10 to show that the patent's teachings regarding the plurality of electronic switches can be implemented in generally other ways (or in a genus) than the five-switch configuration of Figure 11 and also points to the statement that "other switches and switch configurations may be used, of course without departing from the scope of the invention." ('212 Patent at 7, ll: 48–49.)

■ The Court agrees with Philips that a patent's written description may disclose a species sufficient to support a genus. But there are two exceptions to that rule:

(1) where the area of technology is unpredictable, more description is required to show the inventor possessed a broadly-claimed invention; and (2) where a patentee distinguishes the prior art as generally inferior and touts the advantages of the disclosed embodiment over the prior art, the patentee may be found to be in possession of a narrower invention than that one claimed. *See Bilstad,* 386 F.3d at 1125. The second exception applies in this case.

At the motion hearing, the parties agreed that at the time of patenting, two-, three-, and four-switch embodiments were not possible. Philips nonetheless contends that the inventive contribution of the '212 Patent is the use of a BTE waveform, created using a variety of electronic switch configurations, in an external defibrillator. But at the time of the patent filing, Powers overcame the PTO office rejection by arguing that he, as one of ordinary skill in the art, could not get around the major design challenges of the five-switch Swanson patent because there were no means described in that patent for protecting against a load fault and because he could not implement the teachings of Swanson in an external defibrillator because the five-switch circuit in that patent could not tolerate voltages in excess of 1500 volts. Given these concessions, the invention contained in the '212 Patent is necessarily narrower than that which is described by the term "plurality of electronic switches."

Viewing the evidence in the light most favorable to Philips, the Court concludes that Cardiac Science has established by clear and convincing evidence that the written specification in the '212 Patent does not allow a person of ordinary skill in the art, without undue experimentation, to recognize that the inventive contribution of the '212 Patent is the use of a plurality of electronic switches to create a BTE waveform for use in an external defibrillator. In essence, there is no support for the

broad claim of "plurality of electronic switches" in the specification. Like the claims at issue in *LizardTech*, the specification here provides only a single way of overcoming the problems encountered in the prior art, namely by use of the five-circuit switch as illustrated in Figure 11. Philips has produced no evidence, and the Court did not find any on its own, to create a genuine issue of material fact with respect to whether the specification contemplates a more generic way using a BTE waveform in an external defibrillator.

Moreover, there is no dispute that Powers disavowed the five-switch configuration in the Swanson patent and admitted that it was extremely difficult to solve the design challenges presented by the Swanson patent. In light of those statements, the '212 Patent's boilerplate language that "other switches and switch configurations may be used" is insufficiently specific to satisfy the written description requirement imposed by § 112, ¶ 1. Therefore, the Court grants Cardiac Science's motion with respect to the written description requirement and finds Claims 8–10 of the '212 Patent invalid under 35 U.S.C. § 112, ¶ 1.[1]

### III. The Safety Switch Patent

Cardiac Science's '085 Patent is entitled "Charging and Safety Control for Auto-mated External Defibrillator and Method" and referred to by the parties as the "safety switch patent." The patent describes a safety circuit for AEDs that allows for earlier charging of the capacitors and quicker release of a defibrillation shock than prior methods, which is important because "[t]ime is a critical factor in the effectiveness of the administration of defibrillation." ('085 Patent at 1, ll: 29–30). The safety circuit also protects against unintentional discharge of the defibrillator, thereby serving as a "significant safety check" against inadvertent shock delivery by confirming that an emergency medical operator has indeed requested that a defibrillation shock be delivered. (*Id.* at c. 5, ll: 14–21.)

Cardiac Science alleges that Philips' Heartstart FR2 and Heartstart Home/Onsite AEDs (collectively, the "Heartstart products") infringe Claims 1, 2, 4, 8, 14, and 16 of the '085 Patent. Phillips now moves for summary judgment on those claims, asserting that its AEDs do not infringe the safety switch patent either literally or under the doctrine of equivalents.

### A. Infringement

Determining whether a patent claim has been infringed involves two

---

**1.** In reaching this conclusion, the Court did not rely on Dr. Higman's declaration and therefore does not need to address Philips' *Daubert* argument. Moreover, the Court need not reach Cardiac Science's alternative argument with respect to noninfringement given its conclusion about the invalidity of Claims 8–10. Finally, although the Court need not reach the issue, it also concludes that the '212 Patent fails to satisfy the enabling requirement contained in 35 U.S.C. § 112, ¶ 1. "To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365 (Fed.Cir.1997) (internal citations omitted). As the Federal Circuit recently explained, the enabling requirement and written description requirement are closely related, and the two requirements usually rise and fall together. *LizardTech*, 424 F.3d at 1344–45. That observation is true in this case. Viewing the evidence in the light most favorable to Philips, the Court concludes that Cardiac Science has established by clear and convincing evidence that specification of the '212 Patent does not teach, without undue experimentation, those skilled in the art how to make and use the full scope of the invention claimed in Claims 8–10. Therefore, the Court grants Cardiac Science's motion with respect to the enabling requirement and finds Claims 8–10 of the '212 Patent invalid under 35 U.S.C. § 112, ¶ 1.

steps: (1) claim construction to determine the scope of the claims, followed by (2) determination whether the properly construed claim encompasses the accused structure. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir. 1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The Court completed the first step in its April 20, 2006 *Markman* Order. The second step, whether literal or under the doctrine of equivalents, involves a question of fact. *See Bai,* 160 F.3d at 1353. "Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device, i.e., when the properly construed claim reads on the accused device exactly." *Cole v. Kimberly–Clark Corp.,* 102 F.3d 524, 532 (Fed.Cir.1996). "Thus, a literal infringement issue is properly decided upon summary judgment when no genuine issue of material fact exists, in particular, when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Bai,* 160 F.3d at 1353.

■■■ An accused device that does not literally infringe a claim may still infringe under the doctrine of equivalents if each limitation of the claim is met in the accused device either literally or equivalently. *Cybor Corp. v. FAS Tech., Inc.,* 138 F.3d 1448, 1459 (Fed.Cir.1998). "What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case ... consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform." *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 24–25, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

■■■ A patentee can establish equivalency by showing that any difference between a claim limitation and an element in the accused device is insubstantial. *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.,* 285 F.3d 1353, 1359 (Fed.Cir.2002). The parties agree that one way a patentee may do so is by demonstrating that the claim limitation and the accused device perform substantially the same function, in substantially the same way, to achieve substantially the same result. *See id.* Although infringement under the doctrine of equivalents requires an intensely factual inquiry, a claim of infringement under the doctrine of equivalents may also be decided on summary judgment where the evidence is such that no reasonable jury could determine two elements to be equivalent. *See Warner–Jenkinson,* 520 U.S. at 37, 39 n. 8, 117 S.Ct. 1040.

### B. Claims 1, 2, 4, 8, and 14

■■■ Claim 1 of the '085 Patent reads as follows:

1. An automated external defibrillator comprising:

a charging circuit for preparing and temporarily storing a defibrillation shock;

a manually actuated trigger switch mechanism for generating a defibrillation shock release request signal;

monitoring and analysis means operably communicatively coupled to the trigger switch mechanism for pre-qualifying release of a defibrillation shock in response to the defibrillation shock release request signal from the trigger switch mechanism; and

*a safety switch mechanism* operably communicatively coupled to the trigger switch mechanism, *separately responsive to the defibrillation shock release request signal* from the monitoring and

analysis means, for connecting a pre-qualified release of a defibrillation shock to patient electrode terminals.

('085 Patent at c. 6, ll: 28–43 (emphasis added).) Claims 2, 4, and 8 are dependent on Claim 1. Here, the dispute centers on Claim 1's "safety switch mechanism ... separately responsive to the defibrillation shock release request signal." Independent Claim 14, as the parties agree, is essentially the same as Claim 1 in that it describes a "safety switch mechanism, separately responsive to the trigger switch mechanism from the monitoring and analysis circuit to connect the pre-qualified defibrillation shock to patient electrode terminals, thereby separately assuring that the trigger switch mechanism was manually actuated." ('085 Patent at c. 8, ll: 20–25.)

In its *Markman* Order, the Court construed the phrase "safety switch mechanism" to mean "the safety switch does not close until after the processor receives the defibrillation shock release request and pre-qualifies release of the defibrillation shock." (April 20, 2006 Order at 40.) The Court also construed the phrase "a safety switch mechanism ... separately responsive to the defibrillation shock release request signal" to mean "the safety switch responds to a signal from the rescue/trigger switch without input from the monitoring and analysis means."[2] (*Id.* at 42.)

### 1. Literal Infringement

The parties agree that the Heartstart products operate essentially identically for the purposes of this motion and that the Heartstart products and the patent claims each have a shock button, two integrated circuits that together monitor the electrodes and perform analysis, and an isolation relay. But Philips asserts that there is no literal infringement because its products perform their function differently than the invention claimed in the '085 patent. According to Philips, after one of its shock buttons is pushed, a signal is sent to two parts of the monitoring and analysis circuitry. When one of those parts senses the signal, it queries the other part to see if the second part received a signal. If both parts agree, the first part sends the isolation relay a relay drive signal to close the relay. Given this, Philips contends that its Heartstart products do not literally infringe the safety switch patent because the shock button does not directly send the isolation relay a signal.

In response, Cardiac Science contends that the Heartstart products' safety switches close without input from the monitoring and analysis means and that they therefore infringe Claims 1, 2, 4, 8, and 14. Specifically, Cardiac Science explains that Heartstart products' safety switch logic system does not receive signals from the monitoring and analysis means because separate software routines control the closure of the isolation relay and the launching of the HV bridge.

Viewing the evidence in the light most favorable to Cardiac Science, the Court agrees with Philips that there is no genuine issue of material fact with respect to literal infringement as to Claims 1, 2, 4, 8, and 14. No reasonable jury could find that every limitation recited in Claim 1 is found in the Heartstart products. As discussed in the *Markman* Order and illustrated in Figures 2, 3, and 4, the safety

---

**2.** The parties agree that the Court inadvertently used the term "monitoring and analysis circuit," in its *Markman* construction when it should have used the term "monitoring and analysis means." The parties further agree that the function of "monitoring and analysis means" is for "pre-qualifying release of a defibrillation shock in response to the defibrillation shock release request signal from the trigger switch mechanism" and that the corresponding structure is the processor.

switch in the '085 Patent is not connected to the processor and does not receive input from the processor. Rather, the switch receives input directly from the shock button, and a shock is not delivered until the monitoring and analysis means detects a shockable condition and the shock button is pressed. In contrast, the safety switches in the Heartstart products respond directly to input from the monitoring and analysis means; they do not respond to a signal sent from the shock button. Given this, the Court grants Philips' motion with respect to literal infringement on Claims 1, 2, 4, 8, and 14 of the '085 Patent.

### 2. Doctrine of Equivalents

■ Philips also asserts that its products do not infringe Claims 1, 2, 4, 8, and 14 under the doctrine of equivalents because its products do not perform substantially the same function in substantially the same way to achieve substantially the same result. According to Philips, the primary purpose of the safety switch patent is to prevent processor malfunction that could result in an inadvertent shock to a patient. The '085 Patent prevents this problem by delivering a defibrillation shock only after the shock button in manually pushed, as opposed to delivering a shock after receiving a signal from a processor. In contrast, the Heartstart products guard against processor malfunction by utilizing greater processor control—i.e., *with* input from the monitoring and analysis means. Specifically, as described above, the Heartstart products require both processors to agree that the shock button was pressed before closing the isolation relay and delivering the defibrillation shock.

Cardiac Science responds by stating that those of ordinary skill in the art would understand that separate components performing the two functions and a signal computer chip performing both functions are technically interchangeable with each other. It also argues that the safety switch alone, as opposed to a safety switch separately responsive from the monitoring and analysis means, is the element that must be found through equivalents. Finally, it argues that summary judgment is inappropriate because the doctrine of equivalence involves a highly factual inquiry and that a jury could find it its favor.

■ The Court disagrees. Where an accused device performs substantially the same function to achieve substantially the same result but in a substantially different manner, there is no infringement under the doctrine of equivalents. *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed.Cir.2000) (affirming district court's grant of summary judgment finding no infringement under the doctrine of equivalents because defendant used a different process to achieve same result of patented invention). Viewing the evidence in the light most favorable to Cardiac Science, the Court concludes that no reasonable jury could determine that a safety switch that *requires input* from a monitoring and analysis means and a safety switch that closes *without input* from a monitoring and analysis means are equivalent, despite the fact that both prevent inadvertent shock to a patient. Moreover, a finding of equivalence would vitiate the claim element requiring that the safety switch be separately responsive. *See Warner–Jenkinson*, 520 U.S. at 39 n. 8, 117 S.Ct. 1040. Therefore, it is appropriate for the Court to grant Philips' motion with respect to infringement of Claims 1, 2, 4, 8, and 14 of the '085 Patent under the doctrine of equivalents.

### C. Claim 16

■ Claim 16 of the '085 Patent describes a method for delivering a defibrillating shock and reads as follows:

16. A method for providing a defibrillation shock using an automated external defibrillator having AED circuitry including an electrical power supply interconnected to a charging circuit capable of preparing and temporarily storing a defibrillation shock, a pair of electrodes connected to the charging circuit, a processor for controlling operation of the AED, an analysis circuit connected to the processor, and a trigger switch operably coupled to the AED circuitry for initiating generation of a defibrillating shock, the method including the steps of:

> turning the AED on;

> activating the charging circuit to prepare and store a defibrillation shock;

> *instigating the analysis circuit simultaneously to the actuation of the charging circuit;* and

> generating the defibrillating shock, deliverable to a patient.

('085 Patent at c. 8, ll: 44–61 (emphasis added).) At the *Markman* hearing, the Court construed the phrase "instigating the analysis circuit simultaneously to the actuation of the charging circuit" to mean "performing analysis at the same time as the high voltage capacitor begins to charge." (April 20, 2006 Order at 39.)

With respect to Claim 16, Philips asserts that its Heartstart products do not literally infringe or infringe under the doctrine of equivalents under the "proper interpretation" of the Court's construction of the phrase "instigating the analysis circuit simultaneously to the actuation of the charging circuit" to mean "performing analysis at the same time as the high voltage capacitor begins to charge." (*Id.*) According to Philips, the *proper* interpretation of the Court's construction is that "analysis is instigated, initiated, or even provoked at the same time as the capacitor begins to charge." (Philips' '085 S.J. Mem. at 18.)

Under that interpretation, Philips asserts that its products do not infringe Claim 16 because its products begin analysis before and after the capacitor begins to charge.

Philips' arguments are the same as those it presented—and the Court rejected—at the *Markman* hearing. At that stage, Philips argued that the phrase "instigating the analysis circuit simultaneously to the actuation of the charging circuit" should be defined as "performing analysis for the first time when the high voltage capacitor begins to charge." (April 20, 2006 Order at 37.) Based on the specification and the claim language, neither of which require that the analysis be performed "for the first time" when the high voltage capacitor begins to charge, the Court rejected Philips' arguments and construed the term to mean "performing analysis at the same time as the high voltage capacitor begins to charge." (*Id.* at 39.) Nonetheless, Philips ignores this construction and focuses instead on the fact that its Heartstart products begin impedance analysis well before the capacitor begins to charge and begin ECG analysis well after the capacitor begins to charge.

Philips's arguments ignore the Court's reliance on the word "simultaneously" in the claim language and its construction concerning "at the same time." Instead, Philips incorrectly focuses on when analysis is initiated, rather than if analysis is being performed at the same time. When following the Court's construction, a review of the record shows a reasonable jury could conclude that under certain circumstances the Heartstart products begin analysis prior to or concurrent with capacitor charging. Therefore, the Court denies Philips' motion with respect to literal infringement or infringement under the doctrine of equivalents of Claim 16 of the '085

Patent.[3]

## IV. Electrode Patents

 The parties refer collectively to three related patents held by Cardiac Science—U.S. Patent Nos. 5,402,884, 5,579,919, and 5,984,102—as the "electrode patents." The electrode patents are for disposable, packaged electrodes that can be tested without opening their packages.

The '884 and '919 Patents share a common specification and drawings, and the '102 Patent contains additional text and drawings. The '884 Patent, entitled "Medical Electrode Packaging Technology," was issued on April 4, 1995. ('884 Patent at 1.) The '884 Patent generally describes a sealed package structure for housing a medical electrode apparatus that allows for the periodic testing of the electrode without breaking the seal of the package. (*Id.*) The '919 Patent, entitled "Medical Electrode Packaging Technology," was issued on December 3, 1996. ('919 Patent at 1.) It issued from a divisional application from the application that issued as the '884 Patent. (*Id.* at c. 1, ll: 4–5.) The '919 Patent generally describes a sealed package system for housing an electrode apparatus that allows for periodic testing of the electrodes without breaking the seal of the package. (*Id.* at c. 1, ll: 9–34.) The '102 Patent, entitled "Medical Electrode Packaging Technology," was issued on November 16, 1999. ('102 Patent at 1.) The application for the '102 Patent was a continuation-in-part of the application that issued as U.S. Patent No. 5,850,920, which was a divisional application of the application that matured into the '919 Patent. Generally, the '102 Patent describes a prepackaged electrode system with facing gel layers of two electrodes, interposed by a conductive layer from which the gel layers can readily release. (*Id.* at c. 1, ll: 44–50.)

Cardiac Science alleges that the electrode cartridges Philips uses in its Heartstart Home/Onsite AEDs (the "Heartstart products"[4]) infringe numerous claims of the electrode patents. While all three patents disclose various electrode-packaging designs, all of the claims in dispute are directed at the designs illustrated in Figures 13 and 14 of all three electrode patents. Specifically, Cardiac Science alleges that the Heartstart products infringe Claims 1, 2, and 6 of the '884 Patent; Claims 1, 2, 3, 4, 7, 8, 11, 12, 15, 16, and 17 of the '919 Patent, and Claims 1, 2, and 13 of the '102 Patent. Philips now moves for summary judgment on those claims, asserting that the electrode cartridges it uses in its Heartstart products do not infringe the electrode patents either literally or under the doctrine of equalivents because at least three limitations found in the asserted claims of the electrode patents are missing in the Heartstart products. Because the infringement legal standard is discussed above in section III.A., the Court will now discuss each limitation in turn.

### A. Electrical Connection to the Gel Layer

With respect to the '884 Patent, the disputed claims read as follows:

---

3. Because the Court finds that there are genuine issues of material fact with respect to Claim 16, the Court denies as moot Cardiac Science's motion to strike Philips' reply declarations and portions of their reply papers relating to Philips' Motion for Summary Judgment of Noninfringement of U.S. Patent No. 6,029,085.

4. For convenience, the Court will refer to the accused Philips' products as the Heartstart products, although the Heartstart FR2 is not alleged to infringe the electrode patents. For the purposes of this motion, the parties agree that Philips' Heartstart products all use the same essential electrode arrangement. (Philips' Electrode Patent S.J. Mem. at 9; Cardiac Science's Opp'n Mem. at 5.)

1. A sealed packaged medical electrode system for use with an electro-medical device and which permits easy periodic testing of electrode electrical viability without being opened, comprising:

(a.) a first disposable electrode for placement on a patient's body and connection to the electro-medical device, including:

i) a flat, thin, non-conductive base layer;

ii) a conductive semi-liquid gel layer disposed on a side of said base layer, said gel layer being for contact with a patient; and

iii) *conductive connection means communicatively connected to said gel layer;*

(b.) a second disposable electrode for placement on a patient's body and connection to the electro-medical device, including:

i) a flat, thin, non-conductive base layer;

ii) a conductive semi-liquid gel layer disposed on a side of said base layer, said gel layer being for contact with a patient; and

iii) *conductive connection means communicatively connected to said gel layer;*

(c.) a thin, generally flat flexible envelope constructed and arranged to form an interior cavity for enclosing said first and second electrodes, said envelope being constructed entirely of a non-gas permeable polymeric material, and

(d.) said first and second electrode connection means extending outwardly through said envelope, and said first and second electrode gel layers being oriented in a face to face relationship for electrical communication there between, so that current loop is formable between said first electrode connection means, said first electrode gel layer, said second electrode gel layer, and said second electrode connection means without opening said envelope.

2. The packaged electrode system of claim 1, wherein said first and second electrode connection means is an insulated wire, the conductive wire portion of which contacts said gel layer.

. . .

6. The packaged electrode system of claim 1, wherein said electrodes are defibrillation electrodes and where in said electrode connection means conduct high voltage defibrillation currents.

('884 Patent at c. 8, ll: 1–56 (emphasis added).) The dispute here centers on Claim 1's description of the first and second disposable electrodes that include "conductive connection means communicatively connected to said gel layer." In the *Markman* Order, after extensively reviewing the prosecution history of the electrode patents, the Court construed the term "conductive connection means communicatively connected to said gel layer" to mean "a conductive lead or leads that are configured to enable electrical connection to the gel layer." (April 20, 2006 Order at 47.) The parties agreed prior to the *Markman* hearing that this term in the '884 Patent should be construed consistently with the terms "electrically interconnected to the conductive gel layer" and "communicatively coupled to the gel layer" from the '919 and '102 Patents, respectively.

Claims 1, 12, and 17 of the '919 Patent describe an insulated lead wire that is "electrically interconnected to the conductive gel layer." The Court found that "electrically interconnected to the conductive gel layer" means that one end of the insulated lead wire enables electrical connection to the gel layer. (*Id.* at 54.) The term "communicatively coupled to the gel

layer" appears in Claims 1 and 2 of the '102 Patent. The Court construed "communicatively coupled" to mean "configured to enable electrical connection to the gel layer." (*Id.* at 62.) Based on the foregoing, either through their independent or dependent status, Claims 1, 2, and 6 of the '884 Patent, Claims 1, 2, 3, 4, 7, 8, 11, 12, 15, 16, and 17 of the '919 Patent, and Claims 1, 2, and 13 of the '102 Patent all contain a limitation requiring an electrical connection to the gel layer.

There is no dispute regarding the operation of Philips' electrode cartridges in its Heartstart products. The Philips' electrodes are comprised of a base layer called a foam pad, a conductive metal layer called a tin layer, and a hydro-gel layer, with a lead wire that is connected to the conductive metal layer. The electrodes are designed with a notch in the gel layer so that the lead wire is attached directly to the metal layer and therefore has no direct contact with the gel layer.

Philips asserts that its electrode cartridges do not infringe the asserted claims in the '884, '919, and '102 Patents because its electrodes are not directly electrically connected to the gel layer, which Philips asserts is required by the Court's construction. Philips explains that the wires themselves are not configured to electronically connect to the gel layer because, without the metal layer, there would be no electrical connection to the gel layer. Relying on *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736–40, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002), Philips further asserts that its electrodes do not infringe because, as discussed in the *Markman* Order, Cardiac Science cancelled its "three-layer" claims after the patent examiner withdrew those claims because they were "drawn to a non-elected species." (April 20, 2006 Order at 44.)

In response, Cardiac Science asserts that the Court's construction requires only an electrical connection between the lead wires and gel layers, as opposed to a direct physical connection. Because the Heartstart products have an electrical connection between the lead wire and the gel layer, Cardiac Science asserts that the Philips' electrodes infringe the asserted claims of the electrode patents. To illustrate this point, it explains that the gel layer of the Philips' electrode is the portion that would be placed in contact with a patient and that the electrodes would not work if there were no electrical connection between the lead wire and the gel layer. Finally, Cardiac Science contends that Philips' summary judgment motion is simply a veiled attempt to rehash arguments raised at the *Markman* hearing.

As the Court observed in its *Markman* Order, the principal dispute regarding the limitation contained in Claim 1 of the '884 Patent, and the somewhat corresponding terms of the '919 and '102 Patents, is whether these terms are restricted to two layers, as represented in Figures 13 and 14 of each of the patents. (*Id.* at 44.) In essence, Philips asserts that its electrodes do not infringe because they are comprised of three layers and because Cardiac Science disavowed that exact three layer combination in the prosecution of the electrode patents when it elected to two-layer species in response to the patent examiner's restriction requirement.

Normally, prosecution estoppel occurs in the context of a claim rejection where the applicant is required to distinguish his or her invention from the prior art. Here, Philips asserts that Cardiac Science disavowed three-layer electrodes when it responded to the patent examiner's restriction requirement. As the parties know, however, a restriction is not the same as a rejection. *In re Henge-*

*hold,* 58 C.C.P.A. 1099, 440 F.2d 1395, 1402–03 (1971) (finding that Congress did not intend a restriction to be considered a rejection); *R2 Med. Sys., Inc. v. Katecho, Inc.,* 931 F.Supp. 1397, 1438 (N.D.Ill.1996) (explaining that a restriction is not a rejection); *see also Manual of Patent Examination Procedures* §§ 706 and 803 (discussing rejections and restrictions, respectively).

The cases upon which Philips relies are unavailing. Philips has not provided—and the Court could not find—any support for the proposition that simply complying with a required election of species would or should constitute a surrender. In any event, for Philips' argument to succeed, Cardiac Science needed to narrow the scope of its claims. *Cf. Honeywell Intern., Inc. v. Hamilton Sundstrand Corp.,* 370 F.3d 1131, 1142 (Fed.Cir.2004) (discussing *Festo* and explaining that estoppel arises when an amendment is made after a rejection to secure the patent and that amendment narrows the patent's scope). A review of the prosecution history shows that Cardiac Science, if anything, broadened its claims by electing the two-layer species. A claim covering two-layer electrodes could, in certain instances, cover a three-layer electrode. Given this, when following the Court's construction of the electrical-connection-to-the-gel-layer limitation and consistent the prosecution history of the electrode patents, a reasonable jury could conclude that the electrodes in the Heartstart products could be electrically connected to the gel layer. Therefore, the Court denies Philips' motion with respect to literal infringement or infringement under the doctrine of equivalents as it relates to the electrical-connection-to-the-gel-layer limitation.

## B. Wires Extending From the Package

Claim 1 of the '884 Patent describes "first and second electrode connection means extending outwardly through said envelope." ('884 Patent at c. 8, ll: 28–29.) The Court found that this term is a means clause subject to 35 U.S.C. § 112, ¶ 6; that the recited function is providing an electrical connection from the gel layer to outside of the sealed electrode envelope; that the corresponding structures necessary to perform this function are the leads that extend out through the package so that electrical contact from the outside can occur; and that the insulated wires or electrical leads start inside the envelope and extend from the inside to the outside of the envelope. (April 20, 2006 Order at 49–50.)

Claim 1 of the '919 Patent describes a "first lead wire extending from the package to enable the second end to be interconnected to a defibrillator prior to the opening of the package and use of the first electrode." ('919 at c. 7, ll: 46–49.) Claims 12 and 17 of the '919 Patent contain similar language. Consistent with the Court's construction of the "electrode connection means" of the '884 Patent, the Court found that the term "lead wire extending from the package" is properly construed as "the insulated wires or leads start inside the envelope and extend from the inside to the outside of the envelope." (April 20, 2006 Order at 59.) Based on the foregoing, either through their independent or dependent status, Claims 1, 2, and 6 of the '884 Patent and Claims 1, 2, 3, 4, 7, 8, 11, 12, 15, 16, and 17 of the '919 Patent all contain a limitation requiring wires extending from the package.

The parties agree that the wires connected to the Philips' electrodes do not extend through the electrode cartridge. Rather, one end of the wire is connected to the metal layer of the electrodes, and the other is crimped to ring terminals that are attached to hollow brass electrical contacts

molded inside the cartridge tray. A brass contact, sitting below the surrounding surface of the cartridge plastic, is the only part of the circuit that is accessible from outside the sealed cartridge.

Philips asserts that its electrodes do not infringe the asserted claims of the electrode patents because the cartridge that houses its electrodes does not have lead wires or other electrode connection means extending outwardly that pass through an electrode envelope. Instead, its electrode wires terminate inside the cartridge. And, according to Philips, unlike lead wires, these contacts cannot be replaced or detached without destroying the cartridge in the process. Finally, Philips argues that Cardiac Science cannot use the doctrine of equivalents to expand the asserted claims' scope into territory it gave up to get past the prior art (including U.S. Patent Nos. 4,034854, 3,830,229, and 4,423,732) when it amended its claims to include the term "extending outwardly through said envelope."

In response, Cardiac Science contends that under the Court's claim construction, the lead wires need only pass through the surrounding package to allow electrical connection to the outside—i.e., need to be able to be plugged into an electrical source. In essence, Cardiac Science contends that the limitation is met so long as the electrical lead starts inside the package and extends outwardly far enough to allow electronic contact with the outside. According to Cardiac Science, the Heartstart products infringe because they can be plugged into an electrical source. Cardiac Science asserts that Philips' motion is simply an attempt to revisit claim construction to add two limitations to the Court's construction: (1) the lead or wire must comprise one continuous piece and (2) the lead or wire must protrude above and beyond the outside service of the package. Final-

ly, Cardiac Science contends that it did not give up any claim scope in the prosecution of the electrode patents because the patent examiner's rejections were not directed at the wires-extending-from-the-package limitation.

Philips' arguments are similar to those made—and rejected—at the *Markman* hearing. In essence, Philips wants the Court's construction to be limited to one single wire. A review of the patent and the prosecution history does not support such a narrow reading. Moreover, a review of the prosecution history shows that there was no surrender of claim scope with respect to the wires-extending-from-the-package limitation because the amendments made did not narrow the scope of the claims with respect to the wire limitation. *See Honeywell Intern.*, 370 F.3d at 1142. Therefore, viewing the evidence in the light most favorable to Cardiac Science, there is a genuine issue of material fact with respect to whether the Heartstart products' hollow brass contacts reads, literally or equivalently, on the wires-extending-from-the-package limitation contained in the claims asserted in the '884 and '919 Patents. Given this, the Court denies Philips' motion with respect to literal infringement or infringement under the doctrine of equivalents as it relates to the wires-extending-from-the-package limitation.

**C. Conductive Liner Prevents Physical Contact Between the Gel Layers**

█ The claims contained in the '102 Patent are directed at solving a problem of too much adhesion between the face-to-face electrodes. The disputed claims from the '102 Patent read as follows:

1. Packaged medical electrodes for use with an electro-medical device comprising:

a first electrode having; [sic]

a base layer;

a gel layer disposed on the base layer;

a conductive connector communicatively coupled to the gel layer; a second electrode having; [sic]

a base layer;

a gel layer disposed on the base layer;

at least one conductive connector communicatively coupled to the gel layer;

the gel layers of the first and second electrodes being disposed in a facing relationship and having a liner interposed there between, *the liner physically separating the gel layers of the first and second electrodes* and conductively coupling the gel layers of the first and second electrodes; and

a package enclosing the first and second electrodes.

2. The packaged electrodes of claim 1 further including at least two conductive devices, a first conductive device being communicatively coupled to the gel layer of the first electrode and a second conductive device being communicatively coupled to being communicatively coupled [sic] to the gel layer of the second electrode, the conductive devices being selected from a group consisting of:

wire leads; and

snap connectors.

. . .

13. The packaged electrodes of claim 2 wherein the gel layer is a conductive, semi-liquid gel layer disposed on a first side of a base layer.

('102 Patent at c. 8, ll: 2–67 (emphasis added).)

The Court found that, as to the "physically separating" element of these claims, the term "liner physically separating the gel layers of the first and second elec-

trodes" requires a liner that "spaces apart the gel layers so that they are not in physical contact with each other." (April 20, 2006 Order at 63.) The Court also construed the phrase "liner . . . conductively coupling the gel layers of the first and second electrodes" as "a liner made of conductive material that permits electrical signals to pass from one gel layer to the other through the liner." (*Id.* at 64.)

The Heartstart products' electrode liner is made of polyethylene plastic. Current does not pass through this liner; rather, electronic signals pass only when the two gel layers are in physical contact, which occurs through a hole in the center of the nonconductive liner. The hole in the metal layer is larger than the hole in the liner. Philips designed its electrode in this way because it increases resistance and allows the electrodes to determine additional information.

Philips contends that it is entitled to summary judgment with respect to the '102 Patent because its liner is not made of a conductive material that allows electronic signals to pass through it and because its gel layers are in physical contact through the center hole. With respect to equivalents, Philips asserts that its products perform different functions, in different ways, to reach different results than the claimed invention in the '102 Patent. Philips explains that the Heartstart products perform differently because they use a nonconductive liner with a hole in the middle, as opposed to a conductive liner with no hole. According to Philips, their products achieve results in a manner different than the method described in the asserted claims because they necessarily require contact because the non-conductive liner does not allow the electronic signal to flow through it; rather, the electronic signal must flow through the gel layer.

In response, Cardiac Science essentially admits that the Heartstart products do not literally infringe the asserted claims of the '102 Patent. (Cardiac Science Opp'n Mem. at 2, 44.) But it contends that they do infringe under the doctrine of equivalents because any differences between Philips' liner and the claims are insubstantial. Asserting that it is applying the Court's constructions in "good faith," Cardiac Science contends that the Court's construction does not require that a liner achieve 100% physical separation between the gel layers. Moreover, it argues that the liner in the Heartstart products are actually conductive.

The Court agrees with Philips. Cardiac Science's argument—that a hole in a liner is equivalent to no contact and a conductive liner is equivalent to a non-conductive liner—would vitiate two particular claim elements. *See Warner–Jenkinson,* 520 U.S. at 39 n. 8, 117 S.Ct. 1040. Attempts to find equivalents between opposites fails as a matter of law. *See, e.g., Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.,* 291 F.3d 1317, 1322 (Fed.Cir.2002) (comparing recent equivalence cases involving "minority" and "majority" and "above" and "between" and affirming district court's grant of summary judgment under the doctrine of equivalents). Moreover, the differences between the alleged claims in the '102 Patent and the Heartstart products are not insubstantial; Phillips' electrodes perform different functions, in different ways, to reach different results. Viewing the evidence in the light most favorable to Cardiac Science, the Court concludes that no reasonable jury could determine that a liner physically spacing apart gel layers and a liner that allows the gel layers to touch are equivalent or that a conductive liner and a non-conductive liner are equivalent. Given this and Cardiac Science's concession about literal infringement, the Court grants Philips' motion with respect to non-infringement of Claims 1, 2, and 13 of the '102 Patent.

## Conclusion

For the reasons stated above, **IT IS HEREBY ORDERED THAT:**

1. Cardiac Science's Motion for Summary Judgment on the Issues of Invalidity and Noninfringement of Claims 8–10 of U.S. Patent No. 6,047,212 (Doc. No. 454) is **GRANTED.** Claims 8–10 of the '212 Patent are invalid under 35 U.S.C. § 112, ¶ 1.

2. Philips' Motion for Summary Judgment of Noninfringement of U.S. Patent No. 6,029,085 (Doc. No. 477) is **GRANTED IN PART** with respect to non-infringement as it relates to Claims 1, 2, 4, 8, and 14 of the '085 Patent and **DENIED IN PART** with respect to non-infringement as it relates to Claim 16 of the '085 Patent.

3. Cardiac Science's Motion to Strike Defendants' Reply Declarations and Portions of Their Reply Papers Relating to Motion for Summary Judgment of Noninfringement of U.S. Patent No. 6,029,085 (Doc. No. 516) is **DENIED AS MOOT.**

4. Philips' Motion for Summary Judgment on the Electrode Patents (Doc. No. 472) is **GRANTED IN PART** with respect to non-infringement as it relates to Claims 1, 2, and 13 of the '102 Patent and **DENIED IN PART** with respect to non-infringement as it relates to Claims 1, 2, and 6 of the '884 Patent and Claims 1, 2, 3, 4, 7, 8, 11, 12, 15, 16, and 17 of the '919 Patent.

5. Based on the parties' input and the Court's understanding of the case, the trial in this matter will be scheduled for sixteen (16) trial days.